IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF NORTH CAROLINA
CHARLOTTE DIVISION

| | |
|---|---|
| BARBARA MAN, )<br>)<br>      Plaintiff, )<br>)<br>vs. )<br>)<br>HOUSING AUTHORITY OF THE )<br>CITY OF CHARLOTTE, N.C., a/k/a )<br>CHARLOTTE HOUSING AUTHORITY,)<br>)<br>      Defendant. ) | COMPLAINT<br><br>Civil Action No.: 3:15-cv-239 |

**NOW COMES** the Plaintiff, complaining of the Defendant, and alleges and says as follows:

1. Venue is proper in the Western District of North Carolina.

2. This action arises out of the Fair Housing Act.

3. All prior conditions precedent have been satisfied prior to filing this action in that the Plaintiff filed a Complaint with HUD on July 25, 2013 which was within one (1) year of the alleged denial of her request for reasonable accommodations and within two (2) years of the denial of the same.

4. The actions of the Defendant are continuing in nature.

5. Plaintiff has been a resident of a residence commonly referred to as Strawn Towers. Her residence began on or about March 13, 2013.

6. Defendant is a municipal corporation formed on December 21, 1938 and incorporated in the State of North Carolina.

7. Upon information and belief, Strawn Towers is owned and managed by the Defendant, through its property manager, Jewel Fernanders (hereinafter referred to as "Fernanders").

8. This is a violation of Section 804b and/or f, 804a and/or f3B of Title VIII of the Civil Rights Act of 1968 as amended by the Fair Housing act of 1988.

9. This is also a violation of Section 504 of the 1973 Rehabilitation Act.

10. Defendant received Federal funding in the form of Public and Indian Housing.

11. Plaintiff suffers from multi-chemical sensitivity syndrome (hereinafter referred to as "MCS," "MCS Disorder," and "multiple chemical sensitivity disorder").

12. Plaintiff is disabled, largely due to the effects of said syndrome.

13. Plaintiff belongs to a class of persons whom the Fair Housing Act protects from unlawful discrimination because of disability.

14. Plaintiff occupies a rental unit at Strawn Towers which is designated as nonsmoking.

15. An agreement was made with Defendant that Plaintiff should be placed in an end unit next to a door.

16. Plaintiff was not placed in an end unit.

17. Further, Plaintiff was placed in a unit next to a janitor room and as a result industrial chemical odors would come into her unit through duct work between her unit and the janitor room.

18. Defendant along with Fernanders used discriminatory terms and conditions and refused to approve Plaintiff's reasonable accommodation requests subsequently denying housing.

19. On March 13, 2013, Plaintiff signed a lease with Strawn Towers for Apartment 814 and could not reside there due to multiple documented problems. Plaintiff also discovered that there was no phone jack in said unit and it is a necessity due to her disability for her to have a land line.

20. On April 3, 2013, chemical pesticides were sprayed inside Plaintiff's home without her required permission. Plaintiff had not requested such spraying. This resulted in a poisoned environment for Plaintiff. Under her doctor's care, remediation was required and takes time to be effective.

21. On April 3, 2013, Plaintiff contacted her physician, Dr. Allan Lieberman, regarding the pesticide application in her home. Dr. Lieberman responded with a detailed letter that explaining her disability and medical need for ozone remediation with an ozone machine. Dr. Lieberman is a specialist for occupational & environmental medicine who has been Plaintiff's physician since January 3, 2006.

22. Dr. Lieberman's letter has been on file with Defendant since April 5, 2013 but has been ignored.

23. On April 12, 2013, Plaintiff ordered the rental of an ozone machine, at her own expense, per Dr. Lieberman's orders.

24. On April 15, 2013, Plaintiff received the ozone machine and on April 16, 2013 she began a seven day remediation to detoxify her home.

25. On or about April 23, 2013, Plaintiff attempted to reside in her apartment at Strawn, but within the first week of residing there, she noticed cigarette smoke. As a result, Plaintiff contacted a friend to see if she could stay with her temporarily.

26. On or about April 23, 2013, Plaintiff received a letter from her pulmonologist, Dr. Spangenthal, confirming that there must be absolutely NO PESTICIDES EVER SPRAYED in Plaintiff's home due to medical reasons surrounding Plaintiff's disability. Although Dr. Spangenthal's letter was provided to Defendant, they again used pesticides on September 4, 2013 in Apartment 407 before Defendant was to move into that apartment.

27. On April 23, 2013, Plaintiff submitted a Resident Complaint Form and asked to be reimbursed for several months' rent paid on Apartment 814 since Plaintiff was not able to reside there due to not having a phone jack as well as an application of pesticides by Defendant in Plaintiff's apartment. Plaintiff could not reside in her home during remediation of the pesticides. Plaintiff also requested to be reimbursed for the out of pocket rental of the ozone machine. This rental was as per orders of my physician.

28. On April 23, 2013, Plaintiff filed a follow up request asking when she could expect her refund.

29. On April 23, 2013, Plaintiff gave Fernanders the letters from Plaintiff's doctors which identified her medical condition and acknowledged her sensitivity to chemicals.

30. On April 30, 2013, Plaintiff filed an anonymous complaint through the Resident Manager, Sandra Wilbourn, regarding smoking in the building. Plaintiff received no response from Fernanders. Witnesses to second hand smoke are: Sandra Wilbourn, Linda Mataya, Ben Gregory, Suzanne Williams and Julia Sain. This list has been provided to HUD Jennifer Jones.

31. On May 2, 2013, Plaintiff filed a second anonymous complaint through Ms. Wilbourn.

32. On May 3, 2013, Plaintiff reminded Ms. Fernanders of her disability and the need for maintenance procedures that are not a threat to her health. Plaintiff informed Ms. Fernanders that she knew the drains were going to be cleaned with very strong chemicals that are dangerous to my MCS/EI disability and potentially life threating. Plaintiff requested another product be used for this cleaning that is approved by her doctor and that Strawn maintenance not clean her drains until she could find out what kinds of products are safe for her.

33. On May 3, 2013, the resident manager, Sandra Wilbourn, approached Ms. Fernanders on Plaintiff's behalf regarding her request for drain cleaning to be non-toxic.

34. On May 6, 2013, Fernanders wanted to speak to Plaintiff alone regarding the "Request For Reasonable Accommodations" paperwork. Plaintiff could not see Ms. Fernanders

at the time requested and was not comfortable meeting with Ms. Fernanders without the resident manager in attendance.

35. On May 7, 2013, Plaintiff was informed by Ms. Wilbourn that she was no longer able to assist Plaintiff with her complaints and was no longer allowed to come into the office with her.

36. On May 7, 2013, Plaintiff submitted a reasonable accommodation request to Defendant due to her disability from her multiple chemical sensitivity disorder. Said request was denied.

37. Plaintiff made several requests for reasonable accommodations regarding the ductwork and air quality in her unit and complained that cigarette smoke seeped into her unit through the ductwork.

38. One of Plaintiff's requests was denied because it was "incomplete" and her other requests were ignored.

39. On May 14, 2013, Plaintiff wrote a letter to Alicia Price informing her of Plaintiff's medical condition and the problems she was having with Fernanders. Plaintiff never received a response to her letter.

40. On May 14, 2013, Plaintiff submitted another reasonable accommodation request to Defendant asking that the ductwork be rerouted from the hallway outside her apartment to prevent the transfer of pollutants into her unit. Plaintiff explained that she could smell smoke and cleaning products in her unit which emanated from other units in the building. Plaintiff explained to Defendant that the contaminated air within her apartment was making her very ill because of her disability. Plaintiff requested to be placed in a hotel until the air quality in her unit was improved.

41. Although Plaintiff had previously provided documentation to Defendant from her physician confirming that she has a multiple chemical sensitivity disorder disability, Plaintiff's reasonable accommodation requests were denied.

42. When Plaintiff signed her lease, she was told that her unit had a self-contained ventilation system. The maintenance manager at Strawn, Jeff, later confirmed that to Plaintiff. Further, environmental testing performed on June 21, 2013 also confirmed same.

43. Plaintiff told Defendant that there was every indication that either something was wrong with the ventilation system in her unit or it was not, in fact, self-contained, as toxic chemicals and second hand smoke were seeping into her apartment through the ventilation system in her unit. The contamination in Plaintiff's apartment was confirmed later by the Environmental Inspection results documented in Plaintiff's residence.

44. On May 14, 2013, Plaintiff sent correspondence to Alisha Price, Regional Manager for Defendant and Ms. Fernanders's supervisor. This letter regarded Plaintiff's

unanswered complaints against Ms. Fernanders. Said correspondence was copied to Shannon Bodnar. Plaintiff never received any response to said correspondence.

45. On May 14, 2013, Plaintiff informed Ms. Fernanders by letter that she had filed a complaint about her, to Alisha Price.

46. At this time, although Plaintiff continued to pay rent for her apartment at Strawn Towers, Plaintiff could not reside at said apartment due to the condition of the residence and its detrimental impact on her due to the effects of her disability. Rather than staying in said residence where she was being poisoned daily, Plaintiff was virtually homeless and had to sleep wherever she could find temporary shelter.

47. On May 20, 2013, Plaintiff filled out a complaint to Defendant regarding smoking on the 8th floor of Strawn.

48. On May 20, 2013, Plaintiff asked Defendant's representative, Shaunte' Evans to put her in hotel. Plaintiff stressed the urgent need for Plaintiff to be provided with a hotel room or safe environment as her disability was endangering her health which could cause her to go into anaphylaxis shock and potentially die. A copy of said letter was sent to Mr. Meachem, CEO of CHA. Mr. Meachem did not respond to Plaintiff.

49. On May 21, 2013, Plaintiff filled out a Resident Complaint Form regarding second hand smoke coming from various sources surrounding her apartment. Plaintiff took her complaint directly to the office at Strawn Towers. Plaintiff identified Apartment 812 as the main source of the smoke, as that is what was required of Plaintiff pursuant to her lease with Defendant. The smoke odor in her home was concentrated within her hall closet and kitchen area. Plaintiff reiterated in her complaint that the smoke was very noticeable during the day when she would stop by her apartment to pick up belongings. Although she did not reside in my home 99% of the time, she had nowhere to go and on occasion would try to sleep in her own bed. On those occasions there was smoke in her apartment.

50. Plaintiff owned an air purifier and around that time she was able to purchase a high quality air filter for the purifier in an attempt to clean the toxic air. This purifier is a quality product and even it could not take care of all the toxicity that was being pumped into Plaintiff's home. It wore out her expensive filter within a very short time.

51. On May 23, 2013, Fernanders visited Plaintiff's unit and offered to release Plaintiff from her lease.

52. Also on May 23, 2013, Fernanders issued a flyer that the complex would be treated for pests in early June, 2013.

53. On May 28, 2013, Plaintiff submitted a reasonable accommodation request to Defendant identifying that she is allergic to pesticides. Said request was verified by Plaintiff's physician.

54. Plaintiff thereafter received a response from Shaunte Evans dated May 30, 2013 addressing a previously submitted complaint but said response did not address her most recent reasonable accommodation request.

55. As a result of Plaintiff's requests being denied and/or ignored by Defendant, she was forced to stay away from her apartment because the air quality in the unit continued to impact her medical condition.

56. On June 11, 2013, Plaintiff submitted another request to Defendant for reasonable accommodation which stated that she needed a transfer to an ADA apartment with heat pumps that are not next to another unit with clean air flow due to Plaintiff's disability from multiple chemical sensitivity disorder. Plaintiff again informed Defendant in said request that she is allergic to chemicals, second hand smoke, pesticides and perfumes as a result of her MCS disorder.

57. On June 11, 2013, Defendant offered to move Plaintiff to a scattered site unit rather than a high rise, but the offered accommodation was not suitable as it was not an LEED certified building. Plaintiff is required to reside in an LEED certified building as a result of her disability.

58. On July 1, 2013, Plaintiff submitted another reasonable accommodation request to Defendant asking to be transferred to a one bedroom apartment in Strawn Apartments because of air quality.

59. Defendant decided to put their decision regarding Plaintiff's request on hold pending a meeting between the parties and Julia Sain, Director of Disability Rights and Resources, and the investigator. Said meeting was scheduled for July 22, 2013.

60. At the July 22, 2013 meeting, Defendant agreed to place Plaintiff on a waiting list for the first available one bedroom unit in a LEED certified building.

61. On August 24, 2013, Plaintiff requested to be placed in a studio unit in another LEED certified building until a one bedroom unit became available. Defendant agreed to said request.

62. On September 17, 2013, a one bedroom unit became available in Plaintiff's building.

63. Plaintiff moved from Apartment 814 into Apartment 407 in October, 2013.

64. Prior to said move, all of Plaintiff's belongings were saturated with second hand smoke from the seven months that she resided in Apartment 814.

65. After moving into Apartment 407, although Plaintiff had the residual ozone cleared from the air and all of her belongings, the odor of second hand smoke still pervaded her new apartment.

66. Plaintiff thought said odor was coming from her belongings which had been moved from Apartment 814 so began to discard many articles of clothing, art supplies, office supplies, personal items, bedding, among other things. Plaintiff then repeatedly washed other clothing and bedding, trying to salvage what she could.

67. Despite her efforts to get rid of the odor, Plaintiff still noticed the odor of second hand smoke coming out of the ventilation system in Apartment 407.

68. Plaintiff thought that the HVAC's were recirculating the air from her airspace.

69. Jeff Alligood, the maintenance manager of Strawn at that time, told Plaintiff that each unit had self-contained airflow (see results of air quality test, June 21, 2013). Because of that information, Plaintiff had believed that her first apartment (Unit 814) had a faulty ventilation system.

70. In March 2014, Plaintiff bagged up all of her clothing, bedding, towels, and anything else she had that could be emitting residual second hand smoke odor. Plaintiff then removed those items from her home and thoroughly cleaned all surfaces. The second hand smoke odor was still coming through the HVAC system into Plaintiff's unit. As a result, Plaintiff concluded that there were still indoor smokers surrounding her unit.

71. Plaintiff began doing what her lease agreement advised. She identified the source and reported the second hand smoke to the best of her ability. Plaintiff notified Fernanders and filed a resident complaint form on or about May 13, 2014.

72. Plaintiff continues to document the sources of second hand smoke on the floor on which she resides and on other floors.

73. The only time the second hand smoke odor is undetectable is when industrial cleaner is being pumped through the ventilation system, which has been occurring since July 2014, or the occasional ozone machine residual. The same is also toxic to Plaintiff and her MCS disability.

74. On February 10, 2014, Plaintiff received an email from Jennifer Jones that Fair Housing investigator, Aileen Arreaza, had finished her investigation of Plaintiff's discrimination complaint and found no reasonable cause of section 804c was violated as alleged and that no discrimination was found. The report was to be mailed to Plaintiff's representative, Julia Sain, with Disability Right and Resources.

75. Plaintiff is in formed and believes that Aileen Arreaza left her position at Charlotte Mecklenburg Community Relations at the end of February 2014.

76. On February 26 and 27, 2014, Jennifer Jones of HUD, Atlanta, GA, came to Charlotte and tried to conduct a conciliation between Plaintiff and Defendant. Plaintiff had finished a partial damage worksheet at that time and was still working on the medical restitution section with her physician. During this time, Ms. Jones told Plaintiff that she could have signed

off on the Fair Housing investigation and it would have been over. She indicated that she did not have to conduct the 504 HUD investigations. Earlier, Ms. Jones had reiterated to Plaintiff that 2 separate investigations would be conducted).

77. Ms. Jones told Plaintiff that it would not look good on her part if she refused to conciliate. This was contrary to the HUD conciliation fact sheets she had emailed to Plaintiff in November 2013. She also told Plaintiff that she was not to add in pain & suffering, although this was included in the damage worksheet sent to Plaintiff by Ms. Jones. Ms. Jones told Plaintiff it was a generic worksheet, not hers (although it stated on the worksheet "HUD Inquiry #HUD case").

78. Ms. Jones also told Plaintiff at this time that had Defendant transferred her to Autumn House (an offer that Shannon Bodnar, Director of CHA had made to Plaintiff the previous Summer) then Defendant would have had to comply with Plaintiff's disability with the entire building. Ms. Jones visited Plaintiff's apartment and took extensive photos of the HVAC in her living room. Plaintiff also told Ms. Jones that she had proof of indoor second hand smoke in her old apartment. Plaintiff informed Ms. Jones that she had saved the used air filter and had same stored.

79. On February 26, 2014, Julia Sain asked Plaintiff to turn in what she had regarding her damage worksheet. Plaintiff gave to Ms. Sain half of her damage worksheet. Ms. Sain knew it was incomplete and turned it in to Jennifer Jones anyway. Ms. Jones used this incomplete amount to offer Defendant a "conciliation" amount. Julia Sain later told Plaintiff she did not know that Jennifer Jones was going to turn in an incomplete amount. When Plaintiff gave Ms. Sain the medical restitution amount she told Plaintiff the offer could not go up in amount. Plaintiff told Ms. Sain that she had not made the first offer, so the conciliation failed.

80. On March 10, 2014, Plaintiff met with Julia Sain in her office where Ms. Sain was reading from Jennifer Jones' report of her investigation. Ms. Sain did not offer Plaintiff a copy of said report. She stated to Plaintiff that at first Ms. Jones did not think discrimination occurred but that she later realized that discrimination had in fact occurred. Ms. Sain stated that Aileen Arreaza had circumvented the discrimination investigation by only investigating sexual, religious and racial discrimination and NOT Plaintiff's MCS/disability discrimination. Ms. Sain said she had visited the CMCR office to educate them on disability discrimination.

81. On March 26, 2014, Plaintiff spoke w/ Julia Sain after receiving the Fair Housing Determination. Ms. Sain told Plaintiff that the date of the determination was not March 20, 2014 as stated on the top of the page, that it was much earlier and that Plaintiff had passed the 30 day time limit for reconsideration. Plaintiff then phoned the Fair Housing office and was told by Mr. Ratchford that the determination was written in stone and that she could not challenge it. Jennifer Jones later confirmed to Plaintiff that she knew these conversations had transpired.

82. Julia Sain then told Plaintiff that Ms. Jones was going to take her time writing up her determination and said that Plaintiff was not to contact her. Any damages Plaintiff received would be up to Defendant. Ms. Sain told Plaintiff that Ms. Jones did her 504 investigation only

because Plaintiff appealed Ms. Arreaza's investigation. Said statement is contradictory to the timeline or information Plaintiff was given by Jennifer Jones.

83. On April 16, 2014, Plaintiff was informed by a neighbor, Ann Teague, that another resident had made a threat against her that "something bad" was going to happen to her if she didn't stop turning in complaints about indoor smokers in the building. Ms. Teague filed a complaint against the other resident and Plaintiff accompanied her to the office when she turned in said complaint. Fernanders told Plaintiff and Ms. Teague that it would aggravate the problem by speaking to that resident and that she was too busy right then to have a resident meeting or to send out flyers to the residents.

84. Over the next month, Plaintiff feared for her safety due to the amount of overt hostility directed toward her by the smokers in the building. Plaintiff didn't feel safe in her own apartment so she stayed away from her home, especially at night, staying with a friend.

85. On April 17, 2014, Plaintiff felt the need to reach out for help beyond local resources and therefore wrote to the Secretary of HUD in Washington, DC, sending copies of said correspondence to Senator Richard Burr and Senator Kay Hagan.

86. Plaintiff made repeated complaints to the security officers at the front desk of the building regarding other residents who smoked indoors in the evenings.

87. On May 18, 2014, Plaintiff emailed Fernanders and copied her supervisor Alisa Price and blind copied Mr. Meachem, CEO, CHA. By that evening there was a notice on Plaintiff's door, dated May 15, 2014 announcing a resident meeting on May 21, 2014. Residents receiving this notice were told it was "mandatory". During this meeting management indicated that the residents had to sign a lease addendum which stated as follows:

> *"Residents with respiratory ailments, allergies or other conditions relating to smoke are put on notice that CHA does NOT assume any higher duty of care to enforce this lease addendum than any other CHA obligation under the lease".*

88. Plaintiff and the other residents in attendance were made to feel that it was mandatory that they sign the addendum so they did so. Plaintiff later discovered that other residents who had not attended the meeting were never contacted about signing such addendum.

89. Because of the wording of the addendum, Plaintiff felt that it targeted her specific MSC symptoms when exposed to cigarette smoke.

90. On June 4, 2014, Plaintiff received a letter from Senator Richard Burr's office to contact Ledger Morrissette of Charlotte Mecklenburg Community Relations, per Jennifer Jones, to reconsider investigations results of Fair Housing.

91. On June 16, 2014, the entire ventilation system at Strawn Towers was treated with scented "drain cleaner." Such product is toxic to Plaintiff and others with MCS. As a result, Plaintiff was no longer able to reside in her home.

92. On June 18, 2014, Plaintiff returned home briefly after the cleaning was finished. Plaintiff had a violent headache, nausea and vertigo and the odor from the scented product had filled her apartment. Plaintiff contacted her doctor who advised that she find alternative housing because of all the indoor smoking still continuing and other contamination in her airspace.

93. On June 24, 2014, Mr. Morrissette told Plaintiff that Ms. Jones's investigation was finished and under review. Plaintiff was told that upon completion of the review she would receive closing documentation. He told Plaintiff to contact Ms. Jones to send it to her. He also mailed forms to Plaintiff for the reconsideration process.

94. On July 16, 2014, Plaintiff phoned Jennifer Jones. She told Plaintiff that it was a lot of work to convince her boss Carlos, of the "findings" regarding the non-smoking policy, but it had finally gone through. She asked Plaintiff what it would take to make her whole. Ms. Jones told Plaintiff that she would phone her on July 25, 2014 for Plaintiff's answer, at which time Defendant CHA would make an offer and that HUD would send a team to Charlotte to force them to. At a later time Ms. Jones told Plaintiff that she had been wrong in saying this.

95. On July 17, 2014, Plaintiff telephoned city council representative Patsy Kinsey's office and spoke with Robin regarding scented products used in the HVACs at Strawn Towers before a HUD inspection. This spraying is against LEEDS protocol. Plaintiff asked her to inform Mr. Meachem to please stop this, as Plaintiff's disability requires that she breath as clean–air as possible and that she was being poisoned by the chemicals being used at Strawn Towers. Jennifer Jones later told Plaintiff that Strawn used these chemicals as they just wanted to put their best foot forward because of the HUD inspection.

96. Strawn Towers has continued to use a scented product in the hallways on the 3rd, 4th and 5th floors causing the scents from said chemicals to come into Plaintiff's apartment through the ventilation system. This makes it physically challenging for Plaintiff to even visit her home. Plaintiff has repeatedly notified Defendant's attorney, Harriet Huell, by email about this situation.

97. Plaintiff did not hear from Jennifer Jones by July 25, 2014. Plaintiff learned that Ms. Jones was on vacation. Ms. Jones emailed Plaintiff on August 4, 2014 to telephone her.

98. On August 4, 2014, Plaintiff faxed a letter to Ledger Morrissette, CMCR that she was not going to ask for reconsideration of FH Determination, that she was currently working with Jennifer Jones and that she was trusting in this process with Ms. Jones.

99. On August 5, 2014, Plaintiff made an offer to Defendant for payment to her in the amount of $20,000.00 and that they move her to Parktown, or, in the alternative, that Defendant pay to Plaintiff the sum of $30,000.00 and that she would leave the CHA system. Defendant turned down both offers.

100. On August 15, 2014, Plaintiff's physician wrote a letter on her behalf asking Defendant to put Plaintiff in a non-smoking hotel to provide comfort to her until alternative housing could be found.